## CALKINS v. FIRST NATIONAL BANK OF CUSTER CITY.

In an action for wrongful conversion against a bank which acquired title under a mortgage given by a purchaser from the plaintiff, the record of an action by the plaintiff against the purchaser to set aside a sale to him was admissible to show the invalidity of the transfer as between them.

A person receiving a mortgage of personal property pending an action to recover the property or its value is not affected by the doctrine of lis pendens.

Evidence held not to show that a mortgagee of personal property had either actual or constructive notice of a suit relating to the property.

(Opinion filed, April 3, 1906.)

Appeal from Circuit Court, Fall River County. Hon. Levi McGee, Judge.

Action by Israel Calkins against the First National Bank of Custer City. Judgment in favor of plaintiff. Defendant appeals. Reversed and new trial ordered.

*Martin & Mason* and *S. E. Wilson,* for appellant. *Cleveland & Juckett, Ed. L. Grantham,* and *Chauncey L. Wood,* for respondent.

HANEY, J. This action was commenced in August, 1898. The complaint was in the usual form, alleging the conversion by defendant in June 1897, of a band of horses owned by plaintiff and branded "IC." Defendant's answer denied each of the allegations of the complaint and alleged that during June, 1897, it was the owner of a large number of horses branded "IC"; said horses then and there being in Custer county, S. D., and that defendant removed a portion of said horses, to-wit, about 160 head, from the county of Custer to the eastern part of the state of South Dakota for the purpose of disposing of the same as the defendant had a good and lawful right to do. On January 23, 1903, the jury returned a verdict in favor of the plaintiff for $2,188. Subsequently defendant's motion for a new trial was denied, judgment entered on the verdict, and this appeal taken.

The first assignment of error to which attention is called by argument of counsel is the refusal of the court to direct a verdict in favor of the defendant. The plaintiff testified: "I have lived at Hot Springs 12 years. I have known the "IC" bunch of horses for 25 or 30 years and owned the original band." Witness then

gave the history of the band from the beginning; "I signed that bill of sale in jail, down in lower town." The bill of sale was introduced in evidence. It was in the usual form, executed by Israel Calkins and Elizabeth Calkins, in the presence of M. S. James and Seth Gifford as witnesses (the latter was then sheriff), recited a consideration "of $2,000 to him in hand paid at or before the delivery of these presents, by Levi W. Perkins, of Custer county, S. D., the receipt of which is hereby acknowledged," and described the property as follows: "All of the horses, mares and colts and all of the young colts not yet branded belonging to the said mares, all of which are branded "IC" on the left shoulder. These presents are a complete transfer of the said brand 'IC' and all the horses, mares, and colts bearing said brand; one coach horse stallion about 10 years old, weight 1,500 pounds, named 'Fox'; all the mules I own, three wagons, two saddles, one bridle, two sets of harness"— and contains a general warranty against all and every person and persons whomsoever, dated March 16, 1891. "I took proceedings to recover that band of horses in 1892. Before beginning such proceedings, I was away from that part of the country, at Yankton— that was after the making of this bill of sale—in the State Hospital for Insane. After my return I took action to recover those horses. I offered to pay Mr. Perkins the amount received by me and take a transfer back of the horses. He refused and I brought suit, which was prosecuted to judgment." Plaintiff offered in evidence the decree of the circuit court of Custer county, in the case of Israel Calkins v. Levi W. Perkins, which was received. This judgment was entered on May 26, 1897; recited a trial of the case at the regular May, 1896, term of court, the findings of the court's decision in writing, and thereupon adjudges that the plaintiff, Calkins, have and recover of and from the defendant Levi W. Perkins, the possession of all that certain band of horses known as the "IC" band, together with all the produce thereof excepting such portion as has been disposed of by defendant since March 16, 1891, and accounted for by him to the plaintiff; then follows a detailed description of the property, ranging in value from $5 to $17.50 each, making an aggregate value of $2,325. The witness then detailed his endeavors to recover the horses in suit. Seventy-one head of the "IC"

band are in litigation 'at Faulkton, S. D., and are not in controversy in this proceeding. He also described certain of the horses heretofore recovered by him from various parties.

Plaintiff's wife testified: "Q. I will ask you if you had or claimed any interest of your own in the band of horses described in the bill of sale offered in evidence, signed by yourself and husband? A. No, sir; I did not. Mr. Calkins was in jail when he signed this bill of sale. He was afterwards taken to the insane asylum. He was taken from home and his children in June, and kept down there in that little hole [the jail], and afterwards sent to Yankton, about the first of August, and he was there about six months, and he came back the last of January or first of February, 1892. The sale of these horses for that amount [$2,000], at that time, was for the purpose of enabling Mr. Calkins and myself to furnish a cash bond of $1,000, which was furnished while Mr. Calkins was still in jail." Records of the circuit court were introduced showing an indictment was found against the plaintiff on November 22, 1890, which was dismissed November 18, 1891. Defendant introduced a chattel mortgage in the usual form, dated February 25, 1893, executed by Levi W. Perkins to the First National Bank of Custer City, mortgaging 145 head of horses, all branded "IC" on left shoulder, lately purchased from Israel Calkins, 'together with the increase thereof as security for the payment to said bank of $2,600, and interest, as expressed in two promissory notes dated February 25, 1893, one for $2,000, payable March 12, 1893, and one for $600, payable May 26, 1893, with interest at 12 per cent per annum until paid. The mortgage contains the usual warranty and provisions as to possession and sale in case of default; sale to be had after giving at least 10 days' notice thereof, and was witnessed by W. F. Hanley and F. A. Towner. It was afterwards filed for record with the register of deeds of Custer county, October 29, 1895, at 10:45 a. m. The notes referred to in it are the notes offered in evidence. The report of the chattel mortgage sale was made by H. N. Ross, deputy sheriff of Custer county setting forth the due advertisement or proper notice of sale with due proof of publication attached. The report also sets forth in due form the fact of the sheriff's sale of the property, covered by said mortgage, on June 12, 1897, to the

First National Bank of Custer, for the sum of $1,392, leaving a deficiency due on the mortgage indebtedness of $1,278.60. The property described in said report of sale consists of 174 head of horses and mares from 3 to 9 years old, branded "IC" on left shoulder, and about 25 head of suckling colts, the increase of said stock. The bill of sale was executed by H. N. Ross, as deputy sheriff, to the First National Bank, and was based upon said foreclosure sale, covering the property therein described and containing the usual provisions.

Levi W. Perkins testified: "I live near Phoenix, Arizona, and am the man who executed the chattel mortgage on or about February 25, 1893, to the defendant upon the "IC" brand of horses to secure two notes, one for $2,000 and the other for $600. I was, at the time, owner of the horses, and had been in possession of them since I bought them in March, 1891. The notes and mortgage were given for money that I borrowed from the bank. I was unable to pay the notes. After demand of payment, the bank took the horses to Custer county, in June, 1897, for foreclosure. After the foreclosure sale, I had no further interest in the horses. My attention was first called to those horses the fall before I purchased them, by Mr. Calkins. He asked if I didn't want to buy them. After that, probably in the early part of 1891, Mr. Calkins wrote me, I think twice, asking me if I wouldn't buy them. Pursuant to one of those letters, a short time before I bought them, I went to Hot Springs with a neighbor to look at them. He said he would sell everything he had for $2,000. I offered him $10 to bind the trade, and said I would have to go to Custer to get the money. He refused, saying if I would come there with the money and the bill of sale for him to sign, I could have the horses. I went to Custer, borrowed the money of the defendant, returned to Hot Springs, and paid Mr. Calkins on the 10th day of March, 1891. I went to his home and found Mrs. Calkins, and she said that he, Mr. Calkins, was in jail. I took the bill of sale there and paid the money; then Mr. and Mrs. Calkins signed the bill of sale. That was the first and only time I found him in jail, or had any part of this transaction with him in the jail building. I didn't know he was in jail." The depositions of T. J. V. Rutkowski, clerk of court

of Custer county, S. L. Caple, county auditor, R. W. Windsor, register of deeds, H. N. Ross; deputy sheriff of Custer county, who made the foreclosure sale, and William G. Porter, attorney for defendant bank in foreclosure proceedings, were read, showing the regularity of the foreclosure sale and proceedings thereafter.

Dennis Carrigan testified: "I have been engaged in the banking business in Custer, S. D., since 1881, and I am president of the defendant bank. Levi W. Perkins borrowed $2,000 of us on March 14, 1891, saying that he wanted to buy a bunch of horses. He gave us security on cattle, saying, when he bought the bunch of horses with the money he received from us, he would change the mortgage from the cattle to the horses, which was done accordingly. The note ran until February, 1893, when it and the mortgage were renewed. There was an increase in the loan of $600, making $2,600 in all. Notes offered in evidence, marked Exhibits 1 and 2. The interest thereon was paid and extensions made from time to time until May 26, 1897." Witness then went through the books of the bank in detail, showing the entries with reference to the original loan, the renewals thereof, with interest payments made thereon from time to time, the account of Levi W. Perkins showing the credits received by him as proceeds of the loans in question, bills receivable book, loan and discount register, individual ledger account with said Perkins, etc., all of which were introduced in evidence. The witness also testified to the publicity and regularity of the foreclosure sale. "I had no knowledge, at the time of the foreclosure of this mortgage, or at any time prior thereto, that Mr. Calkins had any claim or claims to have had any interest or claim upon these horses." In rebuttal, T. J. V. Rutkowski swore that the trial of the case of Calkins v. Perkins was commenced May 15, 1896; that W. F. Hanley, cashier of the defendant bank, was on the regular panel of jurors for said term, but was excused therefrom on May 6, 1896.

The depositions of J. P. Laffey and Henry Frawley were read with reference to their attendance upon the trial of the case of Calkins v. Perkins, in May, 1896, at Custer, during which trial both witnesses talked with Dennis Carrigan, but whether anything was said with reference to the Calkins-Perkins case, witnesses were

unable to say. The deposition of W. A. Smith was read, showing that in 1894, 90 head of horses were listed by the assessor of Fall River county, which were valued by him at $1,405; that this valuation was raised by the board of county commissioners, of which Dennis Carrigan was chairman, to $2,175. The deposition of R. W. Calkins was read to the effect that he came in to attend the foreclosure sale of the bank against Perkins, wishing to buy a horse, but that he heard no offer made of that horse, or any of the horses, at such sale and had no opportunity to bid therefor. The deposition of Frank Walsh, sheriff of Custer county, was read to the effect that he read the notice of foreclosure sale in the Custer Chronicle a few days only before the sale took place. That he did not sign his name thereto. The findings of fact and conclusions of law in the case of Israel Calkins against Levi W. Perkins were offered in evidence, to which offering the defendant objected as incompetent and immaterial; the defendant bank not being a party thereto, and for the reason that such findings and conclusions did not tend in any wise to establish, as against the defendant bank, any of the facts in issue in this case. Van Huston testified that he was present at the foreclosure sale of the horses, at Custer; that after the sale the horses were driven towards the old Perkins ranch. Later on, on the Monday morning following the sale, he saw them northwest of Custer in the opposite direction from the ranch and about 10 miles from Hermosa, closely herded, apparently being concealed.

This was all the evidence, other than that relating to the measure of damages. It certainly does not justify an inference that the mortgage to the bank was made for any other purpose than to secure a bona fide debt. When it was executed Perkins was in possession of the property, his ownership evidenced by bill of sale in usual form. The foreclosure proceedings appear to have been regular. If the mortgage was valid when executed and its foreclosure was regular, the bank's title to the property could be affected only by something that would affect the lien of its mortgage. So the important inquiry is whether the bank acquired a valid lien. Independently of the record in the case of Calkins v. Perkins there was no evidence to justify a jury in finding that the transfer from Cal-

kins to Perkins was either void or voidable. Though the bank was not a party to that action, the record was admissible for the purpose of showing that, as between Calkins and Perkins, the transfer was invalid ab initio, or had been rescinded. Bank v. Calkins, 12 S. D. 415, 81 N. W. 732; Id., 16 S. D. 445, 93 N. W. 646. But the bank could be bound by the result of that litigation to which it was not a party only on the theory that its mortgage was taken with notice of the pendency thereof. The doctrine of lis pendens has been applied to real property without question from the earliest times, but there is a decided conflict of authority on the question whether it has any application to personalty. There are authorities holding that even stronger reasons exist for applying the law of lis pendens to personal than to real property, because the danger of defeating judgments or decrees by a transfer of the subject-matter is much greater in the case of movable than of immovable property. On the other hand, the history of the law of lis pendens and early precedents furnish no authority for its application to personal property, even in actions at law brought for the recovery of specific goods or chattels; the judgment being in the alternative for the return of the property or its value at the option of the defendant, whereas in real actions the only judgment which a successful plaintiff could obtain was one in rem for the real estate, and to apply it to such property would greatly embarrass ordinary trade and commercial transactions.

The cases involving personal property in which the doctrine of lis pendens has been invoked are proportionately very few in number, probably because of several considerations, such as the prevalence of auxiliary remedies by attachment, receivership, and the like, provided by law for taking property into custody upon the institution of an action or suit concerning it, and the various statutes and rules relating to parties to actions. 21 Am. & Eng. Ency. Law, 626, 627. The Calkins-Perkins action was for the possession of the property. It might have been aided by the provisional remedy of claim and delivery. His judgment was for the recovery of the property, or the value thereof in case a delivery could not be had, and damages for its detention. To such an action the doctrine of lis pendens should not be applied. Nevertheless, if the bank had

"actual" or "constructive" notice (as defined in Rev. Civ. Code, §§ 2449, 2450, 2451, 2452) of the pendency of that suit when its mortgage was taken, it should be bound by the judgment rendered therein. 21 Am. & Eng. Ency. Law, 596. The president of the bank positively denies any knowledge of Calkins' claim upon the property at the time the mortgage was foreclosed or at any time prior thereto. The circumstances disclosed by Rutkowski, Laffey, Frawley, Smith, and R. W. Calkins could not have put the bank upon inquiry, because they had not occurred until after the mortgage was executed. There was, therefore, not a scintilla of evidence tending to prove that the bank had either actual or constructive notice of the Calkins-Perkins suit when its mortgage lien was acquired, and the motion to direct a verdict for the defendant should have been granted.

The judgment of the circuit court it reversed, and a new trial ordered.